**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

TAMARA PRICE, GEORGE HENGLE,
REGINA NOTLE, and SHERRY BLACKBURN
*on behalf of themselves and
all individuals similarly situated*

                            Plaintiffs,

v.

MOBILOANS, LLC,

                            Defendant.

Civil Action No.   3:18cv711

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Tamara Price, George Hengle, Regina Nolte, and Sherry Blackburn (collectively, "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendant MobiLoans, LLC ("MobiLoans"), they allege as follows:

### INTRODUCTION

1. This case is about a predatory lending scheme that charged usurious interest rates.

2. Lenders have adopted various schemes to make high-interest loans over the internet while avoiding state usury and licensing laws. For example, some lenders have originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank." When federal regulators began cracking down on these rent-a-bank

arrangements, the rent-a-bank structure was adapted to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity.[1]

3.      This case involves a rent-a-tribe enterprise established and operated primarily by Think Finance, LLC ("Think Finance") and its affiliates and subsidiaries. As the Court is aware, other consumers have filed cases against other participants in the alleged enterprise, which generated hundreds of millions of dollars in profits from illegal loans. *See Gibbs v. Rees*, Case No. 3:17-cv-00386 (E.D. Va. 2017) (transferred to the bankruptcy court sitting in the Northern District of Texas); *Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-00495 (E.D. Va. 2017); *Gibbs v. Haynes Investments*, *LLC*, Case No. 3:18-cv-00048 (E.D. Va. 2018); *Gibbs v Curry*, Case No. 3:2018cv00654 (E.D. Va. 2018); and *Gibbs v Stinson*, Case No. 3:2018cv00676 (E.D. Va. 2018).

4.      After federal regulators shut down Think Finance's rent-a-bank arrangement with First Bank of Delaware ("FBD"), Think Finance established a rent-a-tribe enterprise with several different Native American Tribes, including the Tunica-Biloxi Tribe of Louisiana (the "Tribe"). Under the rent-a-tribe model, loans were made in the name of MobiLoans—a tribal company that served as a front for Think Finance and others. Although MobiLoans was held out as a tribal entity and the actual lender of the internet loans, the Tribe did not serve a meaningful role in the day-to-day operations, did not share in any risk associated with the business venture, and received only a nominal fee in contrast to the profits made by Think Finance and others. On the other hand, Think Finance took on all the risk of the business; received the majority of the profits, along with its

---

[1] *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

investors; provided the infrastructure to market, fund, and collect the loans; and controlled all aspects of MobiLoans' operations, including its bank accounts.

5.      Plaintiffs, on behalf of themselves and the classes set forth below, seek to recover damages and penalties under state and federal law for MobiLoans' conduct and participation in the illegal lending scheme. Plaintiffs further seek a declaratory judgment that the loan agreements related to the rent-a-tribe scheme are void and unenforceable pursuant to Va. Code. § 6.2-1541(A), which provides that any loan containing an interest rate above 12% "shall be void." Similarly, Plaintiff Nolte seeks a declaratory judgment that the loan agreements are void and unenforceable pursuant to Ind. Code § 24-4.5-5-202.

## JURISDICTION

6.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs George Hengle and Sherry Blackburn are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

8.      Plaintiff Tamara Price ("Price") is a natural person and resident of Virginia.

9.      Plaintiff George Hengle ("Hengle") is a natural person and resident of Chester, Virginia.

10.     Plaintiff Regina Nolte ("Nolte") is a natural person and resident of the State of Indiana.

11.     Plaintiff Sherry Blackburn ("Blackburn") is a natural person and resident of Chester, Virginia.

12.     Defendant MobiLoans is a limited liability company doing business as an internet lending website under the domain name https://www.mobiloans.com/. MobiLoans claims to be a tribal lending entity "owned and operated by the Tunica Biloxi Tribe of Louisiana, a federally recognized Indian tribe operating within the tribe's reservation."[2] In return for a small fee, the Tribe allowed the lending scheme to use its name and falsely claim that MobiLoans is operated by the Tribe and on tribal land. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of MobiLoans, did not fund the loans, or handle the servicing or collection of the loans. Additionally, the majority of MobiLoans operations did not occur on tribal land.

## BACKGROUND

**A.      State usury, licensing, and consumer protection laws are designed to protect consumers from predatory and abusive lending practices.**

13.     "Usury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations."[3]  In fact, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."[4]

14.     "All of the thirteen original American colonies aggressively regulated consumer loans with annual interest rate caps of between eight and five percent, with six percent being most

---

[2] *About Us*, MOBILOANS, https://www.mobiloans.com/about-us (last visited Oct. 15, 2018).
[3] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

[4] Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these ancient sentiments, Pope Francis recently explained, "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018).

typical." Peterson, *supra* note 4 at 899. Today, many states have usury limits and consumer protection statutes that reflect these traditional American values. *See id.* at 908-09.

### 1.    Virginia

15.     More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent.[5]

16.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

17.     The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

18.     In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

19.     If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

---

[5] John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77, 77 (1975), *available at* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

20.     Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of predatory lending scheme Defendants participated in, which sought to evade state lending laws, including Virginia's, by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Martin & Schwartz, *supra* note 1, at 758-59).

**2.     Indiana**

21.     Indiana has also long protected its consumers from usurious interest rates. *See Reed v. Coale*, 4 Ind. 283, 288 (1853) (applying Indiana's 6% interest rate cap and stating, "If it be ascertained that the party intended, by the pretence used, to take more than the legal rate of interest, that intent is declared corrupt.").

22.     In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans. Indiana Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

23.     Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds designated interest rates ranging from 15% to 36%. Ind. Code § 24-4.5-3-508.

24. "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." Ind. Code § 24-4.5-5-202.

25. In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees." Ind. Code § 24-4.5-7-409.

**B.     The rent-a-tribe model was developed to evade state usury laws.**

26. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[6] These types of debt traps "are heavily marketed to financially vulnerable consumers."[7]

27. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* note 1, at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

---

[6] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[7] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 6, at 1853.

28.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id.* at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[8]

29.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks.[9]

30.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Johnson, *supra* note 9, at 399; *see also* Martin & Schwartz, *supra* note 1.

31.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Citing this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* note 9, at 399 (footnotes omitted).

32.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies

---

[8] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

[9] *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

to the loans. Such claims have been uniformly denied by courts from a variety of jurisdictions across the country, thus demonstrating the illegitimacy of the rent-a-tribe lending scheme.[10]

**C.     Think Finance adopted the rent-a-tribe scheme to evade state usury laws.**

33.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model.

34.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor.

35.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.

36.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, i.e., the third parties who invested money to allow Think Cash to grow the scheme.

37.     In August 2010, the Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs."

---

[10] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

38.     In response, Think Finance and its investor, Victory Park, collaborated to develop a solution—they decided to adapt their business model to use a tribal entity as a conduit for the loan. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

39.     Think Finance identified state regulation, including interest rate caps and prohibitions on payday lending to be their primary regulatory concern.

40.     Think Finance modeled its rent-a-tribe scheme after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct the tribal lending model, Claudia Callaway.

41.     Instead of using a national bank as a nominal lender, ThinkFinance would use a business entity organized under the laws of a Native American tribe. The entity organized under tribal law would originate loan products that were similar to the loan products originated under the rent-a-bank arrangement.

42.     Within a few days of origination, the loans would be purchased by a limited partnership, GPL Servicing, Ltd. ("GPLS").

43.     GPLS is an employee-less, Cayman Islands limited partnership, which would purchase a 80-99% participation interest in the loans within a few days of being originated by the entity organized under tribal law.

44.     According to Think Finance, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Fin., LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 24) (explaining the creation of GPLS).

45.     With the assistance of Victory Park and Think Finance, "GPLS raised money from investors," and these funds were then used to expand the portfolios of MobiLoans. *See Think Fin., LLC*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 25).

46.     As a part of this process, Think Finance required the participating tribal entity to enter into an agreement with GPLS, which established GPLS's right to purchase an undivided 80-99% interests in the loans, including any income or profits and the loan documents. Upon information and belief, MobiLoans entered into such an agreement with GPLS.

47.     Under the agreement, the participations interests would be sold to GPLS at book value within two days of the origination.

48.     As a result of the purchase, GPLS would be considered for all purposes as, the legal and equitable owner of the interest in each loan product.

49.     In return for the use of its name, the entity organized under tribal law would receive a nominal fee. For example, Great Plains, an entity that fulfilled the same role as MobiLoans, received a service fee of 6%.

50.     GPLS retained a Think Finance subsidiary, TC Administrative Service, as the exclusive provider of the administrative services for the loan products.

51.     TC Administrative would receive any interest, principal, and fees received on the loans.

**D.     Think Finance solicited the Tunica-Biloxi Tribe to form MobiLoans in furtherance of the rent-a-tribe scheme.**

52.     Think Finance presented its rent-a-tribe scheme to tribes as "a unique turnkey solution for helping tribes" to enter the "lucrative market" of "[o]nline emergency cash lending."

53.     Although Think Finance marketed itself to the tribes as assisting the tribes enter the lucrative emergency lending market, in reality, it offered the tribes unfavorable terms with no actual control or meaningful involvement in the business.

54.     Tribes were offered these unfavorable terms on a take it or leave it basis, and through contracting, Think Finance retained control over the tribal entity, even though it was technically formed and owned by the Tribe.

55.     The "turn-key solution" offered by Think Finance included "technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts."

56.     More specifically, Think Finance touted to one tribe that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams."

57.     Think Finance further explained in its sales pitch to one tribe that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss."

58.     Upon information and belief, Think Finance approached the Tunica-Biloxi Tribe in like manner to present its "turnkey" proposal on a take it or leave it basis.

59.     Subsequently, Think Finance, the Tunica-Biloxi Tribe, and others entered into an agreement for a rent-a-tribe venture.

60.     Upon information and belief, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, risk management, application processing,

underwriting assistance, payment processing, and ongoing service support for consumer loans, while the Tribe agreed to form a tribal entity to serve as a front for the lending operations (MobiLoans) and make revisions to the Tribe's code to facilitate the lending scheme.

61.     In return for the use of its names on the loans, MobiLoans would received a nominal fee or percentage of the revenue from the loans.

62.     The Tribe would have no risk associated with the business and would not be required to contribute any of its own money to fund the loan products or the operations.

63.     Indeed, even MobiLoans operating expenses would be reimbursed by nontribal participants in the enterprise.

**E.     MobiLoans received unlawful interest and principal on the illegal loan products.**

64.     Think Finance, together with its affiliates and subsidiaries, GPLS, the Tribe, MobiLoans and others marketed, initiated, and collected on usurious loan products in states where it was illegal for them to do so, including in Virginia and Indiana.

65.     The usurious loan products were originated and collected in the name of MobiLoans.

66.     In order to insulate the enterprise's non-tribal affiliates from liability, all consumers were required to execute Think Finance's standard lending agreement.

67.     Under the terms of the standard agreements, the interest rates charged were significantly greater than Virginia's 12% interest rate cap, using triple-digit interest rates.

68.     Plaintiffs Price, Hengle, and Blackburn are all Virginia consumers who electronically obtained lines of credit originated through MobiLoans while they were in Virginia.

69.     Neither MobiLoans nor any of the other participants in the illegal lending scheme had a consumer finance license when they extended the lines of credit to Plaintiffs Price, Hengle, and Blackburn; nor did they ever attempt to obtain such a license.

70.     Accordingly, the loan product received by Plaintiffs Price, Hengle, and Blackburn are void and uncollectable under Virginia law. Va. Code § 6.2-1541(A).

71.     Similarly, Plaintiff Nolte is an Indiana consumer who electronically obtained a line of credit originated through MobiLoans while she was in Indiana.

72.     Under the terms of her standard agreement, the interest rate charged was significantly greater than Indiana's interest rate cap, using triple digit interest rates.

73.     Neither MobiLoans nor any of the other participants in the illegal lending scheme had the required Indiana license when they extended the lines of credit to Plaintiff Nolte; nor did they ever attempt to obtain such a license.

74.     Accordingly, the loan product received by Plaintiff Nolte are void and uncollectable under Indiana law. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

75.     No less than $9,009 was collected from Ms. Price as a result of her illegal line of credit—most of which was credited as payment for interest or other fees.

76.     No less than $12,940 was collected from Mr. Hengle as a result of his illegal line of credit—most of which was credited as payment for interest or other fees.

77.     No less than $2,451 was collected from Ms. Blackburn as a result of her illegal line of credit—most of which Defendants credited as payment for interest or other fees.

78.     No less than $2,214 was collected from Ms. Nolte as a result of her illegal line of credit—most of which was credited as payment for interest or other fees.

79.     MobiLoans thus received illegal principal, interest, and fees from each of Plaintiff's on their void loans.

80.     Because Plaintiffs' loan products were null and void, it was unlawful for MobiLoans to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs.

81.     Upon information and belief, MobiLoans operated on a national level, similarly violating the laws in other states with similar usury caps and licensing requirements.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM BY ALL PLAINTIFFS)

82.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

83.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Class"—initially defined as:

> All individuals located in Virginia, Indiana, or states with similar laws who took out a consumer loan product with MobiLoans.

> Plaintiffs are members of the Virginia RICO Class.

84.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by the enterprise, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

85.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether MobiLoans conducted the affairs or

participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against MobiLoans.

86.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

87.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

88.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by MobiLoans' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

89. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because MobiLoans acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs seek an injunction ordering MobiLoans to divest itself of any interest in the enterprise, prohibiting MobiLoans from continuing to engage in the enterprise, prohibiting MobiLoans from selling the outstanding balances on the loans to any third parties, and prohibiting MobiLoans from continuing to collect or receive unlawful interest on the illegal loan products.

90. As alleged above, MobiLoans violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

91. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

92. As alleged above, MobiLoans originated usurious lending product on behalf of Think Finance.

93. Further, MobiLoans permitted Think Finance to solicit consumers and collect on the void loans in its name.

94. All of the loan products made to Virginia residents used an interest rate far in excess of twice the enforceable rate in Virginia.

95. All of loan products made to Indiana residents used an interest rate fare in excess of twice the enforceable rate in Indiana.

96.     Further, because the triple digit interest rates used by Defendants were so astronomical and inconsistent with American values, all of the loan products made to residents of states with interest rate caps used an interest rate far in excess of twice the enforceable rate in those states.

97.     MobiLoans conducted in the affairs of the enterprise through the collection of unlawful debt by, inter alia, originating the usurious loans.

98.     This conduct began as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers.

99.     Plaintiffs and the class members were injured as a result of MobiLoans' violations of 18 U.S.C. § 1962(c), including through the payment of unlawful debt.

100.    Accordingly, MobiLoans is liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM BY ALL PLAINTIFFS)**

101.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

102.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the RICO Class:

> All individuals located in Virginia, Indiana, or states with similar laws who took out a consumer loan product with MobiLoans.

Plaintiffs are members of the RICO Class.

103.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained

by MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

104. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants were involved in the conspiracy to violate RICO; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against Defendants for their role in the enterprise.

105. **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

106. **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

107. **Injunctive Relief Appropriate for the Class**.  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because MobiLoans acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs seek an injunction ordering MobiLoans to divest itself of any interest in the enterprise,

prohibiting MobiLoans from continuing to engage in the enterprise, prohibiting MobiLoans from selling the outstanding balances on the loans to any third parties, and prohibiting MobiLoans from continuing to collect or receive unlawful interest on the illegal loan products.

108.    Defendants violated § 1962(d) of RICO by agreeing to use the enterprise to violate § 1962(c) and collect usurious debt. Plaintiffs allege that Defendants' agreement to engage in the conspiracy is evidenced, *inter alia*, by the series of agreements creating the rent-a-tribe enterprise, their origination of the usurious loans and sale to GPLS, and the representations made by Think Finance in soliciting the Tribe.

109.    Plaintiffs and the class members were injured as a result of MobiLoans' violations of 18 U.S.C. § 1962(d), including through the payment of unlawful debt.

110.    MobiLoans is liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(d).

### COUNT THREE: VIOLATIONS OF VIRGINIA USURY LAWS (CLASS CLAIM BY VIRGINIA PLAINTIFFS)

111.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

112.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**Virginia Class**: All Virginia residents who made a payment on any loan product originated by MobiLoans.

**Virginia Subclass**: All Virginia residents who made a payment on any loan product originated by MobiLoans on or after October 15, 2016.

Plaintiffs Price, Hengle, and Blackburn are members of the Virginia Usury Class and Subclass.

113.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

114.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Virginia consumers charged interest in excess of that permitted by Virginia law; (2) whether Plaintiffs may recover from MobiLoans the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against MobiLoans.

115.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

116.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

117.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

118.   All of the loan products made to Virginia consumers by MobiLoans and collected in the name of MobiLoans used an interest rate greater than 12%.

119.   MobiLoans received from the Virginia Plaintiffs unlawful interest on the loan products.

120.   Accordingly, Plaintiffs and the class members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code §§ 6.2-1541; 6.2-305(A).

## COUNT FOUR:
## VIOLATIONS OF INDIANA USURY LAWS
## (CLASS CLAIM BY PLAINTIFF NOLTE)

121.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

122. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class initially defined as follows:

> **Indiana Class**: All Indiana residents who made a payment on any loan product originated by MobiLoans.

> Plaintiff Nolte is a member of the Indiana Usury Class.

123. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

124. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Indiana consumers charged interest in excess of that permitted by Indiana law; (2) whether Plaintiff Nolte may recover from MobiLoans the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Nolte and the class members against MobiLoans.

125. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Nolte's claim is typical of the claims of each putative class member. In addition, Plaintiff Nolte is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

126. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Nolte is an adequate representatives of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent. She has retained

counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiff Nolte and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Nolte nor her counsel have any interests that might cause them to not vigorously pursue this action.

127. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by MobiLoans' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

128. All of the loan products made to Indiana consumers by MobiLoans and collected in the name of MobiLoans were made without an Indiana license and used an interest rate far in excess of the amount permitted under Indiana law.

129. MobiLoans received from the Plaintiff Nolte unlawful interest on the loan products.

130. As a result, Plaintiff Nolte and the Indiana Class are entitled to recover all amounts paid on these void loans, actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees. *See* Ind. Code § 24-4.5-7-409.

**COUNT FIVE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM BY ALL PLAINTIFFS)**

131.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

132.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

> **Unjust Enrichment Class**: All individuals located in Virginia, Indiana, or states with similar laws who took out a consumer loan product with MobiLoans and who paid any amount of principal, interest, fees, or other charges.

> Plaintiffs are members of the unjust enrichment class.

133.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

134.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on MobiLoans; (2) whether MobiLoans knew or should have known of the benefit; (3) whether MobiLoans retained an unjust benefit because the loans were void; and (4) what is the proper recovery for Plaintiffs and the class members against MobiLoans.

135. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

136. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

137. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by MobiLoans' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

138.    All of the loan products made to Plaintiffs by MobiLoans were void and unenforceable under state licensing and usury laws.

139.    Plaintiffs and members of the class conferred a benefit on MobiLoans when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

140.    MobiLoans knew or should have known of the benefit and has been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

141.    It would be unjust for MobiLoans to retain the benefits attained by their unlawful and corrupt actions.

142.    Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from MobiLoans, jointly and severally, all amounts repaid.

**COUNT SIX:**
**DECLARATORY JUDGMENT**

143.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

144.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Declaratory Judgment Class**: All persons who received a loan in the name of MobiLoans when they resided or were located in Virginia, Indiana, or states with similar laws that establish that the loans were void.

145.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and MobiLoans, and the class members may be notified of the pendency of this action by published and/or mailed notice.

146.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate

over the questions affecting only individual class members. The principal issues include: (1)

whether the loan agreements are void under Va. Code. § 6.2-1541(A), Ind. Code §§ 24-4.5-5-202

or another states' equivalent law; and/or (2) whether the loan agreements are void as a matter of

public policy.

147.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of

each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative class. All are based on the same facts and legal theories.

148.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate

representatives of the putative class, because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent; they have retained counsel

competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause

them not to vigorously pursue this action.

149.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the

class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy.

Litigating the validity and enforceability of each loan agreement would prove burdensome and

expensive. It would be virtually impossible for members of the class individually to effectively

redress the wrongs done to them. Even if the members of the class themselves could afford such

individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

150. As explained above, Defendants' loan agreements are void under Virginia and Indiana law. Va. Code. § 6.2-1541(A); Ind. Code § 24-4.5-5-202.

151. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan agreements.

152. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

153. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and any balances are unenforceable under Va. Code. § 6.2-1541(A), Ind. Code § 24-4.5-5-202, and states with equivalent laws.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.     Certification for this matter to proceed as a class action;

B.     Declaratory, injunctive, and damages relief as pled herein;

C.     Attorney's fees, litigation expenses, and costs of suit; and

D.     Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:_____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*